CATHARINE S. ROY and ELIZABETH HANKINS

*v.*

FRANCES B. MONROE, JOSEPHINE MCKEE, MARGARETTA TROXELL, ANNA T. SHARP et al.

1. If the direction of a will, as to the proceeds of the sale of land, require land to be sold, the direction is equivalent to a positive command to sell, and the land will, for the purposes of the will, be deemed to be personalty.

2. Money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted.

3. Where a testator orders his land to be sold, the conversion will, unless a contrary intention distinctly appears, be deemed to have been directed merely for the purposes of the will, and, consequently, if any of those purposes fail, so that the money does not pass under the will, it will, in equity, be considered land and be given to the heir.

4. Land, in its devolution by descent, always follows blood.

5. A residuary legatee, as a general rule, is entitled to all legacies not effectually disposed of by the will, but, to be thus entitled, he must be the general legatee of the testator's whole residuary estate. Where the testator has confined his gift of residue to a particular part of his estate, and excluded another part, the excluded part will not pass under the gift of residue.

On final hearing on bill and answers.

*Mr. Joseph F. Randolph* and *Mr. Frederic W. Stevens,* for the complainants.

*Mr. John R. Emery,* for Josephine McKee and others; *Mr. Edmund D. Halsey,* for himself.

VAN FLEET, V. C.

This is a contest between heirs at law and next of kin, and the principal question to be decided is, which set of claimants are entitled to the property in dispute? The facts necessary to be considered in deciding this question are the following: George W. Greenmyre died testate in September, 1876. His will bears

Roy *v.* Monroe.

date about a year before his death. He left an only child, George
W. Greenmyre, Jr., and a widow. By his will, after directing
the payment of his debts and funeral expenses, he gave all his
property, real and personal, to his executors "in trust," as his
will says,

"to carry out the directions and bequests of this my will; and I hereby
authorize them to sell at public or private sale, and upon such terms, at such
times, and for such prices as they may think best, all my real estate, and to
give deeds for the same."

He next directs his executors to pay the net income of his
estate to his wife for the joint support of herself and his son,
until his son shall arrive at the age of twenty-one years. He
then makes a gift of all his estate, real and personal, to his wife
and her heirs in case his son shall die before he attains twenty-
one years of age. And then his will says:

" When my son attains the age of twenty-one years, then I desire my execu-
tors to take from my estate the sum of $10,000, and the residue of my estate
pay over or convey to my son. Said sum of $10,000 I direct my executors to
invest, and keep invested, and the interest and dividends arising and accruing
therefrom pay over to my son, but not to any creditor or assignee of his, upon
his sole and personal receipt, during his natural life, and at his death pay said
sum of $10,000 to his children."

This is the whole of the will except the clause by which the
widow and Edmund D. Halsey were appointed executors. The
widow renounced, and Mr. Halsey proved the will alone.

The testator died possessed of a very trifling amount of per-
sonal property, but he held title in his own right to two parcels
of land. The executor conveyed one of the tracts, in 1880, for
$165, and the other, on the 20th day of August, 1888, for
$17,500. But the tract last conveyed was subject to a mortgage
for $6,000, made by the testator, so that the amount realized
from that tract, for the estate of the testator, was only $11,500.
The testator's only child was born on the 13th day of May, 1863,
and consequently attained full age on the 12th day of May,
1884. He died intestate on the 27th day of August, 1888, more
than four years after he had attained full age, and only seven

days after the executor made the last conveyance. He died without issue, never having been married. His mind was weak. Prior to the death of his father he had been placed in an institution organized for the care and education of feeble-minded persons, and remained there up to the time of his death. He died in the institution. His mother, the testator's widow, died on the 30th day of November, 1886. She left four daughters, the off-. spring of a prior marriage. She was a widow when the testator married her. These daughters were George's half sisters. They are not, however, of the blood of the testator. The complainants are. They were the testator's sisters and George's aunts. The persons standing nearest in blood to the testator, at the time of his death, were, first, his son, and, second, his two sisters, the complainants. He left no other sister, nor the descendant of a sister, nor a brother, nor the descendant of a brother. The executor has filed his final account, showing a net balance in his hands of $10,763.33. This balance consists entirely of the proceeds of the sale of real estate. In this posture of affairs, it is clear, that if the property in dispute still retains, as between the contestants, the character of land, the complainants are entitled to it, and this will be so, although the fact may be that the land has been converted into money pursuant to the direction of the testator.

The land was sold pursuant to the direction of the testator. It is true, in that part of his will in which the testator gives direction as to the disposition to be made of his land, he does not give an imperative order for its sale, but simply authorizes his executors to sell it, yet, by a subsequent direction which he gave, he made it impossible to execute the principal provision of his will, as he manifestly intended it should be executed, until his land was sold. The provision here referred to is that in which the testator orders his executors, when his son attains twenty-one years of age, to take $10,000 from his estate and invest it, and pay the income arising from it to his son during his life, and the principal to his children on his death. In view of the fact that the estate consisted entirely of land, and that the land could not, without sacrifice, be sold in parcels, and was only worth about

enough to pay the mortgage on it and raise the $10,000, it is plain that this provision of the will could not be carried into effect unless the land was sold. The condition of the testator's estate and the requirements of his will created an exigency which was, in all respects, equivalent to a plain and positive command to sell. The rule on this subject is settled. Said Chancellor Zabriskie, in *Cook's Exr.* v. *Cook's Admr.,* *5 C. E. Gr. 375, 377*: "When land is directed to be sold, absolutely and positively, without any time fixed for the sale, it is considered as converted into money from the death of the testator; but for this the direction must be imperative. If it is optional with the executor whether to sell or not to sell, or if it is only an authority to sell without any direction, then the land retains its character as land until it is actually sold. If the direction of the will, as to the proceeds, require a sale, it is equivalent to a positive direction to sell, and the land is deemed personal property from the death of the testator." In the previous case of *Wurts's Exrs.* v. *Page,* *4 C. E. Gr. 365, 375,* the same chancellor had stated the rule in substantially the same way, and Chancellor McGill, in *Dutton* v. *Pugh,* *18 Stew. Eq. 426, 428,* adopted the statement of it, made in *Cook's Exr.* v. *Cook's Admr.,* as an established principle of equity jurisprudence.

No doubt can, therefore, be entertained, I think, that the money in dispute here must be regarded as having been converted from land into money by the direction of the testator, and that it must accordingly be held, in conformity to well-established principle, that so far as the testator has disposed of the money thus raised, it must pass to those who are entitled to take under his will as personalty and not as land. For, as the leading case on this subject declares, nothing is better established than this principle: that money directed to be employed in the purchase of land, and land directed to be sold and turned into money, are to be considered as that species of property into which they are directed to be converted. *Fletcher* v. *Ashburner,* *1 Lead. Cas. Eq. (4th Am. ed.) 1120.* This principle is the natural result of the dominion which the law confers upon every property owner, who is *sui juris,* over that which he owns in his own absolute right. He has power to do with his own whatever he pleases, so long as he

does not attempt to apply it to uses forbidden by law, and in the exercise of this power he has a right to decide what shall be the nature of his property after his death, and who shall take it, and whether they shall take it as land or as personalty. By force of this principle, it is clear, I think, that the testator's son, on attaining twenty-one, became entitled to the whole of the testator's estate, except the $10,000, and that he took such residue as personalty. The direction of the will is, that when the son attains the age of twenty-one years the executors shall take $10,000 from the estate, and then, in the language of the will, "and the residue of my estate pay over or convey to my son." The direction to pay or convey would indicate that the testator meant that his son should take the residue, either in money or land, in whichever form it might exist when he became entitled to it, but as it was impossible, in consequence of the condition of the testator's estate, and the nature of the property which he left, to raise the $10,000 without selling all his lands, and as equity regards that as done which ought to have been done, it would seem to be clear, according to the principle which must rule in such cases, that the residue, by force of the will, became personalty on the day the testator's son attained full age. There can be no question that if the will had been executed just as the testator meant it should be, that the residue of his estate would, on the day his son attained full age, have consisted entirely of personalty. My judgment is, that the residue passed to the son as personalty, and hence so much of the fund in controversy as represents the residue must be awarded to the son's administrator.

But the $10,000 stand in an entirely different situation. Though the land, which this sum represents, was changed, by a direction contained in the testator's will, from land to money, yet it has so happened that his will does not, in the present situation of affairs, dispose of the money. The testator ordered the conversion for two purposes—*first*, that his son, during his life, might have the income arising from the money; and, *second*, that the principal on his son's death might go to his son's children. The first purpose has been fully accomplished. The second, however, has not been and never can be. The son died without

issue.  The $10,000 are therefore undisposed of.  As to it, the testator died intestate, that is, in the condition of affairs now existing, it must be declared that he had no will concerning it and made no testamentary disposition of it.  And, consequently, nobody can claim it under his will.  It thus appears that the main purpose of the conversion has failed.  Where that is the case, the principle which must govern the judgment of the court, in disposing of the money, is, as I understand the authorities, firmly and clearly established, and may be stated as follows: The money must, for the purposes of succession, be regarded as possessing precisely the same heritable or transmissible quality or character which the property it represents had at the death of the testator, and it must be given to the heir if it represents land, and to the next of kin if it represents personalty; unless the testator has, in his direction for conversion, plainly declared that his intention, in directing a conversion, was not merely to change the nature of his property for the purposes of his will, but to change it for all purposes, whether it passed under the will or not.  An early statement of this principle is found in the decision of Sir Joseph Jekyll, master of the rolls, in *Cruse* v. *Barley, 3 P. Wms. 20*, but, of course, the leading case on the subject is *Ackroyd* v. *Smithson, 1 Lead. Cas. Eq. (4th Am. ed.) 1171.*  That is the case in which Lord Thurlow was compelled, by the convincing force of the argument of the barrister who afterward became one of England's most distinguished equity judges, to decide contrary to his first impression, in favor of the right of the heir.  The most accurate statement of this principle, at least the one which is generally esteemed the most accurate, is that given by Mr. Cox, in his note to *Cruse* v. *Barley*.  " The several cases on this subject," this note says, " seem to depend upon this question : Whether the testator meant to give the produce of the real estate the quality ·of personalty to all intents, or only so far as respected the particular purposes of the will; for, unless the testator has sufficiently declared his intention, not only that the realty shall be converted into personalty for the purposes of the will, but further, that the produce of the real estate shall be taken as personalty, whether such purposes take effect or not, so much of the real

estate, or the produce thereof, as is not effectually disposed of by the will, at the time of the testator's death (whether from silence or inefficacy of the will or from subsequent lapse), will result to the heir." Jarman, in his treatise on *Wills*, while conceding the substantial accuracy of this statement of the doctrine, says that it is not sufficiently explicit, and that, in order to make it a safe guide, this addition should be made to it:

"But that every conversion, however absolute in its terms, will be deemed to be a conversion for the purposes of the will only, unless the testator distinctly indicates an intention that it is, on the failure of those purposes, to prevail as between the persons on whom the law casts the real and personal property of an intestate, namely, the heir and next of kin." *2 Jarm. Wills* (*R. & T. ed.*) *216, 218, 623*.

The American editors of *Leading Cases in Equity* (*vol. 1 4th Am. ed. 1197*) state the principle in this form:

"The conversion of property, from one species to another, by the will of a testator, takes place only for the purposes of the will; and so far as those purposes do not extend, or, in so far as any of them do not take effect in fact or in law, the property is considered as remaining in its former condition, as it was in the hands of the testator, and passes accordingly."

This principle has been recognized by the court of errors and appeals of this state. The chief-justice, in delivering the opinion of that court in *Lerch* v. *Oberly, 3 C. E. Gr. 575, 578*, said : "The principle is established by a multitude of cases, that where real estate is directed, either by the owner or by the order of the law, to be converted into money for a particular object, and a surplus remains after the accomplishment of such object, such surplus, as between the heir and the personal representative of such owner, will be regarded by a court of equity as land and will descend as such." It is an obvious dictate of justice, as well as of common sense, that the direction to convert shall be held to have terminated whenever it becomes impossible to carry out the purpose for which the conversion was ordered, and that when the property, in its changed form, cannot pass by the will which directs its conversion, but must be transmitted by the law, it should go to

the person who would have taken it if it had not been converted, but still remained in its original condition.

Adopting this principle as the rule of judgment, it is plain that the $10,000 must be held to be land, and as such must be awarded to the heirs at law. The conversion was ordered merely for the purposes of the will. That, in my judgment, is clear beyond dispute. The will contains not the least trace or indication that the testator meant that the nature of his property should be changed for any other purpose. As Lord Eldon, in substance, said in his masterly argument in *Ackroyd* v. *Smithson:* It is not necessary for the heir, in a case like this, to deny that the intention of the testator designed him nothing; his intention has certainly been equally unpropitious to his next of kin; but, to disinherit the heir, it is not enough to show that the testator did not intend that he should take, but to do that it must be shown that the testator made a disposition in favor of another. It is both unnecessary and unimportant in this case to decide whether the property in question first passed to the testator's son, and then, on his death, from him to the complainants, or directly from the testator to the complainants. No matter what its course was, there can be no doubt, according to the principle which determines its nature, that it passed as land, and as the defendants are not of the blood of the person from whom it came, they cannot take it. Land, in its devolution by descent, always follows blood.

The case thus far has been dealt with on the foundation on which it is presented in the pleadings. The defendants, by their answer, admit that, in the actual state of affairs which has occurred, the testator died intestate as to the $10,000, and the argument originally made proceeded on that basis. Since then a further argument has been made, in which it was contended that the testator did not die intestate as to the $10,000, but, as that sum was not well disposed of by the will, it passed, under a well-settled rule of construction, to his son by force of the gift of the residue made to him. There can be no doubt that, according to an established canon of construction, the residuary legatee is entitled, unless a contrary intention be manifested, to take all

legacies not effectually disposed of by the will, whether the fail-ure of the gifts, which, under this rule, go in augmentation of the residuum, be the result of lapse, or the inefficacy of the will, or the illegality of a particular bequest. But it is equally well settled that a residuary legatee, to be thus entitled, must be the general residuary legatee of the testator's whole residuary estate. If the testator has circumscribed or confined the residue, which he makes the subject of his gift to his residuary legatee, then his residuary legatee is not a general, but a specific legatee, and can only take that part of the residue specifically pointed out in the gift to him. Or, as was said by Justice Dalrimple, in delivering the opinion of the court of errors and appeals in *Tindall's Exrs.* v. *Tindall, 9 C. E. Gr. 512, 513,* "Where the words used show an intention on the part of the testator to exclude from the opera-tion of the residuary clause certain portions of his estate, the residuary legatee will not take such portions." To the same effect is the opinion pronounced by Lord Cottenham in *Easum* v. *Appleford, 5 Myl. & C. 56, 61,* where, in effect, he said, to take everything which the will does not pass, the residuary legatee must be a general legatee, and if the testator has circumscribed or confined his gift of residue to a particular part of his estate, his residuary legatee, instead of being a general legatee, becomes a specific legatee. The rule, as thus stated, is firmly established. *2 Wms. Ex.* \*1461; *2 Jarm. Wills (R. & T. ed.) 365.* As is obvious, this is the only rule that can be prescribed which will leave in full vigor and preserve inviolate that perfect power of testament-ary disposition which the law confers upon every citizen of full age and sound mind.

Taking this rule as the guide, I do not think it can be held that the $10,000 passed to the testator's son as part of the gift of residue made to him; on the contrary, I think it is clear, beyond dispute, that the testator meant to exclude the $10,000 from his gift of the residue, and that he has said so in language so simple and direct as to exclude all possibility of doubt as to his meaning. The gift of residue is made in these words:

"When my son attains the age of twenty-one years, then I desire my execu-tors to take from my estate the sum of $10,000, and the residue of my estate pay or convey to my son."

This language limits, in the most explicit manner, the thing or part given as residue to what shall remain of the estate after a specific sum is deducted, so that the means which the testator has directed to be used to fix the *quantum* or extent of the residue necessarily excludes the $10,000. Until the $10,000 are taken out there can be no residue, and it is only what is left after the $10,000 are taken out that is given by way of residue. In the language of the court of errors and appeals, in *Tindall's Exr.* v. *Tindall,* the words of the gift show an intention on the part of the testator to exclude from the operation of the residuary clause of his will a certain part of his estate, and where that is the case the residuary legatee cannot take the excluded part. To hold that the testator's son took the $10,000 under the will, would be giving him that part of his father's estate which his father, by his will, has said he should not have. That would be making a will for the father rather than construing the will which he made.

The complainants are entitled to the $10,000. As each of the two sets of claimants have been partly successful, I think neither should be allowed costs against the other. The executor should, however, be allowed costs. The complainants, by their bill, impugned his conduct, and thus compelled him to answer in order to defend himself. But for this he might have remained silent with propriety. I think he should, therefore, be allowed his costs out of the sum awarded to the complainants.